

4:90-cv-01554

122    ks    07/12/94

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
**ENTERED**

JUL 1 2 1994

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ADDITIVE CONTROLS AND          }
MEASUREMENT SYSTEMS, INC.,     }
                               }
          Plaintiff,           }
                               }
vs.                            }          CIVIL ACTION NO. H-90-1554
                               }
FLOWDATA, INC. and TITAN       }
INDUSTRIES, INC.,              }
                               }
          Defendant.           }

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.

### FINDINGS OF FACT:  FACTUAL AND PROCEDURAL BACKGROUND

On July 17, 1990, in response to a petition alleging business disparagment filed by Additive Controls And Measurement Systems, Inc. ("Adcon"), in state court,[1] Counter-plaintiff Flowdata, Inc. ("Flowdata") filed a counterclaim for infringement of Flowdata's U.S. Patent No. 4,815,318 ("the '318 Patent") for a positive displacement flowmeter. Flowdata's Motion for Partial Summary Judgment of Patent Infringement was granted, and in February, 1992, a trial on the merits was heard by the court on Adcon's remaining issue of business disparagement and Flowdata's issues of willful infringement of the '318 Patent by Adcon, unfair competition by Adcon, and Flowdata's damages and attorneys' fees.

On August 2, 1993, as part of a Final Judgment, a permanent injunction was issued. This injunction stated, in part:

---

[1] The original petition filed in the 80th Judicial Disrict Court, Harris County, Texas was removed by Flowdata to this court.



Plaintiff and Counterdefendant Additive Controls and Measurement Systems, Inc. ("Adcon"), its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Final Judgment by actual service or otherwise, are hereby **RESTRAINED and ENJOINED**, from and after the date hereof and until March 28, 2006, or until the date that the United States Letters Patent No. 4,815,318 (the "'318 patent") may be canceled by the United States Patent and Trademark Office for failure to pay any maintenance fee, from directly or indirectly infringing any claims of the Letters Patent No. 4,815,318, by making, using, or selling or causing to be made, used or sold the adjudged infringing flowmeter devices as set forth in Flowdata, Inc.'s ("Flowdata") Trial Exhibits 24, 24-A, 24-B, and 24-C of which Flowdata's Trial Exhibits 2-A, 2-B, 2-C, 2-D and 2-E and drawings thereof and Flowdata's Trial Exhibits Nos. 25 and 25-A, of which Flowdata's Trial Exhibits 2-A, 2-B, 2-C, and 2-D and 2-E are also drawings thereof, and that are attached hereto and incorporated herein by reference for all purposes, (and) any colorable differences or imitations thereof, . . .

Flowdata claims in these proceedings that Adcon has violated this portion of the injunction. The parties have stipulated that only claim 7 of the '318 patent is at issue. The case was tried to the court in February, 1994.

At all times material to these proceedings Galen M. Cotton ("Cotton") was an officer and employee of Adcon. In early 1992, Cotton and R. E. (Dick) Nice ("Nice") of Baton Rouge, Louisiana, discussed a new positive displacement flowmeter that Cotton had developed in January or February, 1992. While the parties were still awaiting the final judgment, after trial of the case in chief, but before March 23, 1992, Cotton began to design

- 2 -

the positive displacement flowmeter referred to herein as the "TruGear meter," all rights to the design of which Cotton is the sole owner.

Shortly after March 23, 1992, Cotton entered into an agreement with David M. Yates and Tom Yates of Albuquerque, New Mexico, in which the parties "consented to join together to form two companies for the express purpose of manufacturing and marketing a device herein referred to as the TruGear Positive Displacement Flowmeter." (Defendant's Exhibit 4, page 2). Under the agreement, Cotton agreed to grant a license for the manufacture of the TruGear meter to a corporation to be formed by the parties and named TruGear, Inc. ("TurGear"). Sales of the TruGear meter manufactured by TruGear, Inc. were only to be to a Texas corporation, incorporated and managed by Cotton and known as Truflo Instrumentation, Inc. ("Truflo").

The Yates brothers were to receive thirty percent (30%) of the shares of Truflo and a seat on the Board of Directors. Cotton was to receive thirty percent (30%) of the shares of TruGear and a seat on its Board of Directors.

In his trial testimony Cotton quoted from Defendant's Exhibit 4, page 4, acknowledging that

> The separate nature of the organizations is not intended to isolate either operation but is intended to provide manageable layers of responsibility and liability. Continuous consultation between the organizations is essential and for the purposes of day to day business should be viewed as a composite whole. Though separate in corporate structure, our day to day functioning should be perceived as one company. Our corporate

- 3 -

> structure should be transparent to our
> distribution organization and our clients.

Cotton also testified that all TruGear meters produced by TruGear would be paid for by proceeds of sales through Truflo. Truflo handled all billings to customers, master distributors, and representatives. Payment for all TruGear meters was to be made immediately to TruGear on receipt of payment by Truflo.

Cotton confirmed that his purpose was to "forge these two independent organizations into an entity that for all practical purposes is an independent singularity. Neither company will be able to function without the other." (Defendant's Exhibit 5).

In the fall of 1992, Cotton approached Nice regarding the possibility of being a master distributor for the TruGear meter. At that time, Nice's company, Nice Instrument Sales, Inc., was a representative for flowmeters of Krohne-America, Inc.; Cotton was Krohne-America's Regional Representative for the region which included Nice's company.

Nice Instrument Services, Inc., was formed in the fall of 1992 to be the master distributor for the TruGear meter. As a master distributor Nice Instrument Services, Inc., took title to TruGear meters upon sale to it by Truflo. On October 27, 1992, Truflo received an order from Nice Instrument Services, Inc., for some twenty-one (21) TruGear meters. Shipment occurred on or about December 8, 1992.

On or about January 25, 1993, Cotton received the non-infringement opinion of his patent attorney, James Jackson.

In the fall of 1993, Flowdata began post-judgment

- 4 -

discovery of Cotton's activities concerning the TruGear meter. Cotton resisted such discovery. He was ordered to respond and was sanctioned with an order to pay reasonable attorneys' fees to Flowdata.

From August 2, 1993, through January 24, 1994, TruGear manufactured, used or sold, under the authority or with the approval of Cotton, some forty-one (41) TruGear meters for a total manufacturing sales price charged to Truflo of $25,538.79.

In August/September, 1993, Nice Instrument Services cancelled its Master Distributorship Agreement with Truflo because of technical problems with the TruGear meter and Cotton's lack of design and manufacturing support. Title to inventory was thereafter transferred to Nice Instrument Sales, Inc., which remained, and still was at the time of trial, a representative of Truflo for the TruGear meter.

On August 27, 1993, Truflo was given actual notice of this Court's injunction. On September 7, 1993, Krohne-America, Inc. was given actual notice of the injunction. On November 16, 1993, David M. Yates, Alpha Southwest, Inc. and Nice Instrument Sales, Inc. each were given actual notice of the injunction. On December 29, 1993, Jack Harshman[2] was given actual notice of the injunction of this Court.

On January 5, 1994, Flowdata requested a trial on its motion for contempt.

---

[2]Jack Harshman assisted Cotton in the design and development of the TruGear meter and was the draftsman who prepared most of the manufacturing and assembly drawings.

## II.

## **FINDINGS OF FACT**

The accused design and the flowmeter at issue are embodied in the TruGear meter of Defendant's Exhibit 10. Promotional literature, authored in part by Cotton, approved by Cotton, and used by Cotton and Truflo in the marketing and sale of the TruGear meter are set forth in Defendant's Exhibits 6, 7, 8, 8A, and 11.

David M. Yates, TruGear and Truflo, Jack Harshman, Nice Instrument Sales, Inc., and Nice Instrument Services, Inc., acted in concert with Cotton and participated with Cotton in the manufacture, use, and sale of the TruGear meter.

Cotton testified with reference to Defendant's Exhibit 10 and the promotional literature of Defendant's Exhibits 6, 7, 8, 8A, and 11, that the TruGear meter has means for providing a chamber which include first and second covers as well as a central chamber element.  The TruGear meter has an inlet and outlet connected to the chamber for communicating fluid through the chamber.  The cover means is connected to the sides of the central chamber element. The TruGear meter contains two (2) rotors mounted in the chamber for rotating in response to fluid flowing through the chamber.  The two (2) rotors have rotational axes that lie in a plane which is perpendicular to a longitudinal axis of the inlet and outlet.

Cotton also testified, with specific reference to Defendant's Exhibit 11, page 339 (Bates coded COT0000423), that shafts are used to connect each of the rotors to the first and second cover means, and that clearance is provided between each end

of each of the rotors and the respective interior of the covers to define spacing means.

Cotton further testified, through Defendant's Exhibit 6, page 2, with reference to the rotors, that the construction "embodies a sophisticated signal generator." He testified that one of the rotor means contains metal "pins" or markers.

The promotional literature (Defendant's Exhibits 6, 7, 8, 8A and 11) and Truflo invoices (Defendant's Exhibits 13-23) establish that Hall Effect, magnetic, analog, and RF "sensors" were manufactured and sold as component parts of the TruGear meter.

Cotton testified that the design of the TruGear meter and the TruGear meter itself could be provided with a ceramic bearing sleeve (as in the drawing of Defendant's Exhibit 12), in lieu of a stainless steel ball, or bushing assembly.

Cotton also testified that the design of the rotors in Defendant's Exhibit 10 were plastic, although they could be made of PVDF (a plastic), stainless steel, aluminum, or PTFE (another plastic). Cotton further testified that the shafts which support the rotors of Defendant's Exhibit 10 are made of stainless steel.

The rotors in the TruGear meter have lobes and valleys which have an intermeshing area during rotation. When one of the rotors of the TruGear meter is actually aligned with one of the rotors of the Adcon device (Defendant's Exhibits 24A-C), it is clear that their geometry is the same. At the point of intermeshing of the two rotors in the TruGear meter, a boundary layer of fluid is formed between the lobe of one of the rotors and the valley of the other rotor, to thereby prevent contact.

Flowdata's technical expert witness, Dr. J. Venn Leeds, is now Professor Emeritus at Rice University. From 1963 until 1989, he taught at Rice University as Professor of Electrical and Computer Engineering. He has considerable actual industrial experience and a formal educational background in fluid mechanics, mechanical engineering, and electrical engineering, as reflected in his Vita, Defendant's Exhibit 28, and established by his testimony. Leeds is qualified to testify about the technical aspects of the '318 Patent, the Adcon meter, and the TruGear meter. He is a person skilled in the art to which the '318 Patent pertains or with which it is most nearly connected, as set forth in 35 U.S.C §112 (1988).[3] Leeds testified, using Defendant's Exhibit 30, that, technically, the design of the TruGear meter, Defendant's Exhibit 10, meets each and every one of the element recitals of claim 7 of Flowdata's '318 patent.

In direct, cross, and redirect examination, Leeds testified that the signal generating means recital in claim 7 was technically satisfied by the pins connected in a rotor and that the sensor was the radio frequency device connected to the outer cover plate. The "signal generating means" is a modification or change of physical space. Such a change of physical space generates a signal. Modification of physical space is similar to the "signal

---

[3]"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full clear, concise, and exact terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112 (1988).

generating means" used in a shoplifting detector in a store (tag attached to merchandise) or in the automatic door opener at the entrance to the Federal Courthouse (a person approaching a door). The "signal generating means" disclosed in the '318 Patent specification that modify physical space include: magnets; colored markers that are different colors than the rotor material; and physical space occupied by the valleys and lobes.

Leeds also testified that the TruGear meter design is no more than a colorable variant or imitation of the Adcon flowmeter of Defendant's Exhibits 24A-C. Leeds further testified that the Adcon device had been "morphed" into the TruGear meter of Exhibit 10, and vice versa. Leeds explained that "morphing" means to change one form or image to another, as in the faces changing from one to another in Michael Jackson music videos and in other such videos shown on Music Television ("MTV"). Leeds prepared Defendant's Exhibit 63, which shows a morphing conversion of the Adcon meter, Exhibit 24A-C, into the TruGear meter of Defendant's Exhibit 10. Through Defendant's Exhibit 63, Leeds demonstrated the morphing of the "race track" form of the chamber of the Adcon Meter into a "equal diameter rotors" form consisting of a circular chamber with the inlet and outlet moved. Despite this change in form the same rotors as in the original Adcon "race track" form are used in the TruGear meter. This second "morphing" view was then shown by Leeds to be further morphed into the final form of the TruGear meter, Defendant's Exhibit 10, showing the same chamber means, inlet and outlet means, but different sized rotors. Leeds testified that the three images were essentially the same meter.

Any design differences were minor and did not go to any of the elements of claim 7 of the '318 patent. Such differences in the TruGear meter were technically no more than colorable variants of the Adcon meter.

Leeds testified that he studied numerous materials furnished to him to make a determination of what was technically meant in the preamble of claim 7 of the '318 Patent by use of the word "bearing-less". In studying this issue he considered other claims, the specification, the summary judgment materials on file with the Court, and the files of the proceedings before the Patent Office of the '318 patent and its parent patent, U.S. Patent No. 4,641,522. Leeds concluded that "bearing-less", as used in claim 7 of the '318 Patent, means that when the rotors are made of a good sleeve bearing type material such as ultra high molecular weight polyethylene, or other plastic, or a good sleeve bearing material with good bearing characteristics, such as those having low co-efficiency of friction and wear resistance, then another bearing or bushing is not "required" or "necessary". Leeds stated that when the rotors of the TruGear meter are made of plastic, aluminum, or stainless steel, such rotors meet this definition.

Leeds further testified, through Defendant's Exhibit 64, which he prepared, that it makes no difference, technically, whether or not the word "bearing-less" is recited in the preamble of claim 7 of the '318 Patent, since the claim would read the same, technically, even if the preamble only stated: "an apparatus, comprising:. . . ." He testified that he understood that the word "comprising" was open-ended and that, technically, all of the

elements of claim 7 in this case would be satisfied with respect to Defendant's Exhibit 10, even when an additional component, such as the ball-bearing, is included in the device of Defendant's Exhibit 10.

Leeds also testified that the ball bearing assembly in the TruGear meter of Exhibit 10 is not essential to its proper functioning. He pointed out that, according to Cotton, the TruGear meter is offered in a version in which a ceramic sleeve bearing is used without a ball bearing assembly. He also testified that the design and meter of Exhibit 10 will work even if the ball bearing component is removed from the device and the design, and that, technically, there was no reason for the ball bearing assembly to be in the device of Exhibit 10. Leeds concluded that, technically, the placement of the ball bearing into the Exhibit 10 meter was only for purposes of an attempt to design around claim 7 of the '318 patent. The court found Leeds to be a credible expert witness, and accepts his testimony as true and his conclusions as justified.

James L. Jackson, Cotton's patent attorney, who was called by Cotton as a combined fact and expert witness, has a B.S. degree in industrial engineering, was a patent examiner at the U.S. Patent and Trademark Office, and is a registered and licensed patent attorney. He testified that the word "bearing-less" was not a limitation as used in the preamble since it did not appear in the body of claim 7 of the '318 Patent. The word "bearing-less" was voluntarily removed from the body of the claims of the parent patent during prosecution before the U.S. Patent Office. The

removal of the word "bearing-less" from within the body of an element of the claims indicated that the word "bearing-less" used in claim 7 is not a limitation, as that term of art is used in patent law and patent application prosecution. That the ball bearing used in the TruGear design of Exhibit 10 is not necessary and was included simply to mask the necessary components in the TruGear meter, Exhibit 10, is clearly shown by Jackson's failure, in preparing and prosecuting the patent application covering the design of the TruGear meter of Exhibit 10, to list this supposedly critical element in either of the independent claims of the patent.

Both Leeds and Jackson testified that if the "pins" or "markers" in one of the rotors of the TruGear meter were removed, the TrueGear meter would not work.

Jackson testified that he did not believe that the "metal markers" on one of the rotors of the TruGear meter was the "signal generating means" and that the RF device was not a "sensor," as those terms are utilized in claim 7 of the '318 Patent.   This testimony is clearly inconsistent, however, with his own written opinion rendered to Cotton: "In contrast, one of the two rotors of the Truflo Meter is provided with a plurality of evenly spaced markers which are located for sensing by an RF sensor which is connected to one of the removable end plates of the flowmeter housing."   (Defendant's Exhibit 27, at page 2).

Jackson also testified trial that in determining the meaning of words or phrases utilized in the patent, he did not apply the test in McGill, Inc. v. John Zink Co., 736 F. 2d 666

(Fed. Cir.), <u>cert denied</u> 469 U.S. 1037 (1984).[4] Nor did he consider the significance of the second and sixth paragraphs of 35 U.S.C. §112 (1988).[5] He did testify, however, that, in his opinion, a means-plus-function claim, such as claim 7 in the '318 Patent, is the broadest type of claim coverage that can be obtained in a patent.

Jackson's written opinion, Defendant's Exhibit 27, was given after sales of the TruGear meter had been effected in December, 1992. It is ineffective in refuting willful infringement because it does not reflect use of the proper considerations and tests required by the Federal Circuit. For example, he used brochures for comparison, as opposed to the actual TruGear meter. He relied only on Cotton for a technical explanation of operation. In many instances he compared the TruGear meter with the Flowdata meter to show non-infringement, as opposed to comparing the TruGear meter to the claims of the '318 Patent. Of significance is the fact that Jackson never considered the language of the injunction

---

[4]<u>McGill</u> recognizes "a whole host of factors " to be considered in construing or interpreting claims. 736 F. 2d at 673. In addition to the examination of the language of claim at issue, sets out as "tools of claim construction" file history, patent specification,... other claims in the patent, [and] testimony by expert witnesses." 736 F. 2d at 675.

[5]"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention....

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structural, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

and did not give Cotton an opinion at any time before the contempt trial as to whether the TruGear meter falls within the scope of the injunction. Cotton offered no qualified technical or legal opinion evidence that the TruGear meter did not fall within the language of the injunction.

## III.

### CONCLUSIONS OF LAW

The Flowdata '318 patent is still in effect and all maintenance fees have been paid to date.

This is a civil contempt action treated as a supplemental complaint for modification of the permanent injunction entered herein.[6]

The Final Judgment restrains and enjoins Adcon, its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the Final Judgment from making, using, or selling flowmeters previously made, used, or sold by Adcon and any flowmeters which are only colorable differences or imitations thereof.[7]

An injunction is "binding upon only the parties to the action, their officers, agents, servants, employees, and attorneys,

---

[6] KSM Fastening Systems, Inc. v. H.A. Jones Co., 776 F.2d 1522, 1531 n.6 (Fed. Cir. 1985).

[7] "The several Courts having jurisdiction of cases under this title may grant injunctions in accordance with the principals of equity to prevent the violation of any rights secured by the patent, on such terms as the Court deems reasonable." 35 U.S.C. §283 (1988).

and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed. R. Civ. P. 65(d).

Cotton, Truflo, TruGear, David M. Yates, Nice Instrument Services, Inc., Nice Instrument Sales, Inc., and Jack Harshman, all and each of them have received actual notice of the injunction by personal service or otherwise, and the injunction is therefore binding upon such parties.

David M. Yates, TruGear and Truflo, Jack Harshman, Nice Instrument Sales, Inc. and Nice Instrument Services, Inc. acted in concert with Cotton and participate in this case with Cotton in the manufacture, use, and sale of the TruGear meter.

Cotton was, at all relevant times, an officer, employee, or agent of Adcon. The injunction contained within the Final Judgment is binding upon Cotton, and this Court has the power to find Cotton in contempt of the Injunction.

Contempt authority is provided to the Federal Courts under 18 U.S.C. § 401 (1988), which enables the Court to punish by fine or imprisonment those who disobey or resist its commands. Such treatment is appropriate in this case since there is no more than a "colorable" difference between the TruGear meter and the original Adcon meter. KSM, 776 F.2d at 1530 ("Proceedings by way of contempt should not go forward if there is more than a "colorable" difference in the accused and adjudged devices."). While "an enjoined party is entitled to design around the claims of a patent without the threat of contempt proceedings with respect to every modified device," KSM, 776 F.2d at 1526, the enjoined party

"bears the risk that the enjoining court may find changes to be too insubstantial to avoid contempt." KSM, 776 F.2d at 1526. "Where it is evident that modifications do not avoid infringement and were made for the purpose of evasion of the Court's order, 'contempt is appropriate.'" KSM, 776 F.2d at 1526.

The question of whether or not a contempt proceeding is a proper forum for deciding a matter is a procedural issue and not an issue unique to patent law. Spindlefabrik Suessen-Shurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 903 F.2d 1568, 1578 (Fed. Cir. 1990).

Because contempt is a procedural matter, Fifth Circuit law applies, rather than that of the Federal Circuit. DMI, Inc. v. Deere & Co., 802 F.2d 421, 428 (Fed. Cir. 1986) ("The Federal Circuit reviews procedural matters that are not unique to patent issues under the law of the particular regional circuit where appeals from the District Court would normally lie.").

"In deciding whether to conduct contempt proceedings, a trial court must act expeditiously to protect litigants from continuing infringements after an adjudication. Further, a trial court may act expeditiously to enforce its orders in the face of conduct ignoring judicial authority." Lund Indus., Inc. v. Go Indus., Inc., 938 F.2d 1273, 1275 (Fed. Cir. 1991).

"Infringement is the sine qua non of violation of an injunction against infringements." KSM, 776 F.2d at 1528.

> [A] judgment of contempt against an enjoined
> party for violation of an injunction against
> patent infringement by the making, using or
> selling of a modified device may not be upheld
> without a finding that the modified device

> falls within the admitted or adjudicated scope
> of the claims and is, therefore, an
> infringement.

Id. at 1530.

In granting Flowdata's motion for partial summary judgment on the issue of infringement, the Court implicitly construed the "signal generating means" of claim 7 to include magnets, and metallic markers or pins and construed "sensing means" in claim 7 to include magnetic sensors, zero motion inductance pickoff coils, and RF sensors.[8] The partial summary judgment also implicitly established that each of the rotors in the Adcon meter satisfied these "sub-elements" of claim 7: (1) "wherein each rotor has plural lobes, separated by valleys;" (2) "wherein the lobes have radiuses smaller than the radiuses of the valleys;" and (3) "wherein at an intermeshing area of the two rotors a boundary layer of fluid forms between the lobe of one rotor and the valley of the other to prevent contact therebetween." As so construed by this Court, the rotors in the new TruGear meter satisfy each and every recital of claim 7 with respect to these particular elements.

---

[8]Cotton argues that there has never been a determination on the merits that the Adcon device infringed the '318 patent. Based, in part, upon admissions contained in the joint pretrial order the Court granted Flowdata's motion for partial summary judgment on the issue of infringement of the patent. Adcon vigorously opposed the entry of the partial summary judgment order. The February, 1992 trial of the remaining issues in the case, which included Adcon's business disparagement claim, included testimony on the patent infringement issue. Cotton participated in the trial and was actively involved in Adcon's defense; he testified that there was no infringement of the '318 Patent by the Adcon meter. This case did not involve a settlement agreement or consent decree on the issue of infringement. Final Judgment was filed August 2, 1993. Adcon gave notice of appeal on September 1, 1993. The appeal was dismissed October 5, 1993.

While there are some geometrical differences between the Adcon meter and the TruGear meter, such changes are no more than colorable. The TruGear device has not been changed from the adjudged Adcon meter in a way which affects an element of claim 7.

If "the modified device has not been changed from the adjudged device in a way which affects an element of a claim....the new device, though modified, may be treated the same as the device which was admitted or adjudged to infringe." KSM, 776 F.2d at 1528-1529 (citing, as accord, Hopp Press, Inc. v. Joseph Freeman & Co., 323 F.2d 636 (2nd. Cir. 1963) (price tags were found to have changed only in use of opaque, rather than translucent, ink and in typeface of numerals) "Colorable changes in an infringing device or changes unrelated to the limitations in the claim of the patent would not present a new cause of action." Foster v. Hallco Mfg. Co., 947 F.2d 469, 480 (Fed. Cir. 1991).

Each of the elements set forth in claim 7 of the `318 patent is in "means-plus-function" format. That format has its foundation in the specific provisions of paragraph six of 35 U.S.C. §112 which, states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structural, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112.

This statute was written to avoid a holding that a "means plus function" limitation must be read to cover only the disclosed

means. <u>Medtronic, Inc. v. Intermedics, Inc.</u>, 799 F.2d 734 (Fed. Cir. 1986), <u>cert. denied</u>, 479 U.S. 1033, (1987); <u>DMI, Inc. v. Deere & Co.</u>, 755 F.2d 1570 (Fed. Cir. 1985).

Words in a patent will be given their ordinary and accustomed meaning unless it appears that the inventor used them differently. <u>Envirotech Corp. v. Al George, Inc.</u>, 730 F.2d 753 (Fed. Cir. 1984). The patentee may define a term himself and that definition may be utilized to give clear meaning to phrases used in claims and in the specification. A patentee may be his own "lexicographer." <u>ZMI Corp. v. Cardiac Resuscitator Corp.</u>, 844 F.2d. 1576 (Fed. Cir. 1988); <u>Fonar Corp. v. Johnson & Johnson</u>, 821 F.2d 627 (Fed. Cir. 1987), <u>cert. denied</u>, 484 U.S. 1027 (1988); <u>Loctite Corp. v. Ultraseal Ltd.</u>, 781 F.2d 861 (Fed. Cir. 1985). In determining the meaning of a word or phrase in a claim that is disputed between litigants, numerous tools are available to make the proper determination of the meaning of the word or phrase. Reference can be made to other claims, the specification, expert witnesses, extrinsic evidence, and the prosecution history before the U.S. Patent and Trademark Office. <u>McGill, Inc. v. John Zink Co.</u>, 736 F.2d 636 (Fed. Cir.), <u>cert. denied</u>, 469 U.S. 1037 (1984).

A "preamble" is an introductory or first phrase of a claim. Preamble statements of intended use are not claim limitations. <u>Loctite Corp.</u>, 781 F.2d at 861. The effect that preamble language should be given can be resolved only in view of the entirety of the patent to gain an understanding of what the inventor actually invented and intended to encompass by the claim.

<u>Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.</u>, 868 F.2d 1251
(Fed. Cir. 1989).

The word "bearing-less" is not a preamble "limitation".
It simply means that a bearing element, such as a ball bearing
assembly is not necessary or required when the rotors are made of
a low coefficient of friction material, such as the proper plastic,
stainless steal or aluminum.  The TruGear design contemplates use
of rotors made of plastic, stainless steel or aluminum.  As such,
when incorporated into the TruGear meter, such rotors come within
the scope of claim 7 of the '318 Patent.  The effective word in a
preamble is ambiguous at best, a compelling reason must exist
before the language can be given any weight.  <u>DeGeorge v. Bernier</u>,
768 F.2d 1318 (Fed. Cir. 1985).  The recital in the preamble is not
incorporated into the body of claim 7 of the '318 Patent, within
one of more of the elements.   In such a situation it is not
necessary to "breathe life" into the claim such that the claim is
distinguishable from the prior art.   <u>Loctite</u> , 781 F.2d at 861
(Fed. Cir. 1985).   In claim 7 of the '318 patent, the word
"bearing-less" may be ignored as a limiting recital.  The claim
reads and means the same whether or not such word is included in
the preamble.

The word "comprising" is a term of art in patent law, and
is "open-ended."   <u>Stiftung v. Renishaw PLC</u>, 945 F.2d 1173, 1178
(Fed. Cir. 1991).    That is, the transitional term, "which
comprises" does not exclude additional, unrecited elements.
<u>Moleculon Research Corp. v. CBS, Inc.</u>, 793 F.2d 1261, 1271 (Fed.

Cir. 1986), <u>cert denied</u>, 479 U.S. 1030 (1987). As stated in <u>Landis On Mechanics of Patent Claim Drafting</u>,

> For example, a claim to "a writing implement <u>comprising</u> a pencil with an eraser fastened at one end" covers any type of erasure-tipped pencil: wood, mechanical, etc.; with or without a clip to hook it in one's pocket; and whether or not additional features or additions are patentable to later inventors. Thus, in patent shorthand, the combination comprising A + B (individual elements or parts) covers A + B + C . . . or A + B' (a variation of element B following under the claim definition).

Robert C. Faber, <u>Landis On Mechanics Of Patent Claim Drafting</u>, 11-12 (3rd ed. 1990).

The '318 patent pertains to rotors (or "gears"), cover plates, fluid chambers, magnets, pins, shafts, fluid flow dynamics, radio frequency devices, electrical circuitry, and the like. In comparing the accused TruGear meter and design to that of the Adcon meter, there is no more than a colorable difference between them. The TruGear meter and design are no more than an imitation of the Adcon meter.

The TruGear meter and design come within the scope of claim 7 of the '318 Patent. Each of the elements and recitals of claim 7 of the '318 Patent are found, clearly and literally, in the accused TruGear meter and design. Claim 7 is literally infringed by the manufacture, use, and/or sale of the TruGear meter.

"Devices that have been modified to such an extent that the modification may be separately patented may nonetheless infringe the claims of the basic patent." <u>Texas Instruments v.</u>

U.S. Int'l Trade Comm'n, 805 F.2d 1558, 1563 (Fed. Cir. 1986),
reh'g denied. 846 F. 2d 1369 (Fed. Cir. 1988).

> [A] product may infringe more than one patent
> and that one may not be able to practice the
> invention protected by a patent directed to an
> improvement of another's patented article or
> method except with a license under the latter.

"Milliken Research Corp. v. Dan River, Inc., 739 F.2d 587, 594,
(Fed. Cir. 1984).

> "[M]ost lay people believe that once they
> receive a patent, their invention has been
> held unique and non-infringing.  Lay persons
> are often surprised by the idea of that they
> can  still  be  responsible  for  infringing
> another dominating patent."

Union Carbide Corp. v. Tarancon Corp., 742 F. Supp. 1565, 1577,
(N.D. Ga. 1990).

The fact that claim 7 of the '318 patent is to a
combination of elements does not limit their scope in the
infringement context. Amstar Corp. v. Envirotech Corp., 730 F.2d
1476 (Fed. Cir.), cert. denied, 469 U.S.924 (1984).  Patented
portions of patented combinations do not exist.  It is the
combination, not any portion or element thereof, that is protected.
Porter V. Farmers Supply Serv., Inc., 790 F.2d 882 (Fed. Cir.
1986); Everpure, Inc. v. Cuno, Inc., 875 F.2d 300 (Fed. Cir.),
cert. denied 493 U.S. 853 (1989).

The manufacture of the TruGear meter by TruGear and the
sales of the TruGear meter by Cotton through Truflo, reflected in
Defendant's  Exhibits  13  through  23  and  Cotton's  testimony,
constitute Cotton's acts of infringement of claim 7 of the '318
Patent and willful violation of the injunction.

## IV.

## REMEDIES FOR CONTEMPT

A.   Law Applicable to Remedies Awarded

Because contempt damages in a patent infringement case do not raise issues unique to patent law, the proper law to be applied is not that of the Federal Circuit, but that of the regional circuit in which the case is decided.   Graves v. Kemsco Group, Inc., 864 F.2d 754, 755 (Fed. Cir. 1988).   The substantive law to apply in determining the remedy is the law of contempt rather than the law of patents:

> CCI's argument fails to recognize that this is
> a civil contempt proceeding, not a patent
> infringement suit.   The patent infringement
> was established in the previous round of
> litigation;   we   here   determine   the
> appropriateness of damages, compensatory and
> exemplary, for willful violation of a court
> order.   In dealing with a civil contempt
> proceeding the district court was not bound by
> the provisions of Title 35, U.S.C. §284.
> Rather it was free to exercise the inherent
> discretion possessed by a court to correct
> willful violations of its solemnly passed
> orders. . . CCI argues that attorney's fees
> and other expenses may only be awarded in
> patent cases in accordance with statutes
> enacted by Congress. . . . We iterate that
> this is not a patent infringement case--it is
> a civil contempt proceeding.   There are
> contempt cases in abundant number holding that
> a court has discretion to award reasonable
> attorney's fees and other expenses necessary
> to make an innocent party whole.

Dow Chem. Co. v. Chemical Cleaning Inc., 434 F.2d 1212, 1214 (5th Cir. 1970), cert denied, 402 U.S. 945 (1971) (citations omitted).

B.    Compensatory and Coercive Damages

        Flowdata is entitled to recover as remedies for Cotton's
contempt:    (1) damages to compensate Flowdata for the losses
sustained as a result of Cotton's contemptuous violation of the
injunction which includes attorneys' fees and costs incurred as a
result of the contempt proceedings; and (2) conditional sanctions
intended to coerce future compliance with the injunction, as long
as Cotton is allowed to purge himself of the contempt and avoid the
coercive sanction by bringing himself into compliance with the
injunction.    Lance v. Plummer, 353 F.2d 585, 592 (5th Cir. 1965),
cert. denied 384 U.S. 929, reh'g denied, 384 U.S. 994 (1966).

C.    Accounting

        Flowdata, for purposes of calculating its compensatory
damages, is also entitled to an accounting to determine the number
of flowmeters manufactured, used, or sold by Cotton or by any
entity connected with Cotton in any way, from August 2, 1993, the
effective date of the Injunction, to the date of the Court's final
order herein.

D.    Amount of Damages

        The Court, under its contempt power, may award double
damages as necessary to compensate Flowdata.    In Dow Chem. Co., the
district court awarded double damages as compensatory damages
because of the knowing and willful violation of the injunction and
the Fifth Circuit found that this award was not an abuse of
discretion.    Dow Chem. Co. , 434 F.2d at 1214.

A court must consider the the factors set out in <u>In re Trinity Indus., Inc.</u>, 876 F.2d 1485 (11th Cir. 1989), when determing civil contempt damages:

> In establishing an amount to impose, the court must consider several factors, including the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about compliance, and the amount of the contemnor's financial resources and consequent seriousness of the burden to him.

<u>In re Trinity Indus.</u>, 876 F.2d at 1493-1494.

## E.   <u>Attorneys' Fees</u>

Flowdata is entitled to recover its reasonable attorneys' fees for pursuing the violation and enforcing the Injunction through the date of the Court's Order herein, and including estimated attorneys' fees for any appeals or rehearings. Attorney's fees are recoverable as part of a party's compensatory damages.   In <u>Lance</u>, the Court held:

> As to appellant's contention that the part of the order requiring the payment of the attorney's fee and the costs of bringing the proceedings were punitive, we think it plain that these requirements were permissible in a civil contempt proceeding.   They are clearly compensatory to the injured party.

<u>Lance</u>, 33 F. 2d at 592.

## F.   <u>Specific Relief Which Flowdata Is Requesting and to Which It Is Entitled</u>

Because this is a civil contempt action and not a patent infringement action, the Court is not strictly bound by statute in fashioning the remedy it awards, but is free to exercise its discretion in correcting the violation of its order.   <u>Dow Chem.</u>

Co., 434 F.2d at 1214-15.  As set out above, the only restraint on the court is that the damages it awards must be either compensatory for the damages suffered by Flowdata by Cotton's contemptuous acts, or coercive to ensure future compliance with the Court's orders.

Although some of these persons and entities are not parties to this action, this Court has the power to enjoin Adcon, Cotton, David M. Yates, Truflo, TruGear, Nice Instrument Sales, Inc., Nice Instrument Services, Inc., and Jack Harshmanthem because, under Fed. R. Civ. P. 65(d), an injunction can be binding on those acting in active concert with the enjoined party.  The aforementioned persons and entities, because they have received the flowmeters from Cotton, would be acting in active concert with him were they to make, use, or sell the TruGear meter.

> Patent law recognizes the ability to extend injunctions under Federal Rules of Civil Procedure 65 to include assignees of an infringer's assets . . . who purchased certain . . . assets after the patent infringement suit was filed. . . . Moreover, under Rule 65(d), a non-party comes under the scope of an injunction imposed against an infringing defendant if the non-party is "in active concert or participation" with the defendant infringer.

In re Dahlgren Int'l., Inc., 819 F.Supp. 568, 577-578 (N.D.Tex. 1992).  See also South Cent. Tel. Co. v. Constant, Inc., 304 F.Supp. 732 (E.D.La. 1969), aff'd 437 F.2d 1207 (5th Cir. 1971). Accordingly, Flowdata is entitled to an order decreeing that each of the aforementioned, Adcon, Cotton, David M. Yates, Truflo, TruGear, Nice Instrument Sales, Inc., Nice Instrument Services, Inc., and Jack Harshman are enjoined from making, using, and/or selling the TruGear meter, until the expiration date of the '318 Patent.

Flowdata is entitled to an order decreeing that Adcon, Cotton, David M. Yates, Truflo, TruGear, Nice Instrument Sales, Inc., and Nice Instrument Services, Inc., are enjoined from destroying or otherwise disposing of any inventory of TruGear meters and/or any parts therefor until an accounting for the TruGear meter is submitted to this Court, and until the expiration date of the '318 Patent.

Flowdata is entitled to an order decreeing that Adcon, Cotton, David M. Yates, Truflo, TruGear, Nice Instrument Sales, Inc., Nice Instrument Services, Inc., shall each provide to this Court and to Flowdata an accounting of all sales made and all amounts received from any manufacture, use, and/or sale of the TruGear meter.

This Court is allowed to act upon probable and inferential proof as well as direct and positive proof when determining a damage award, and has discretion to determine the basis for setting the amount of civil contempt damages which need not be calculated with mathematical precision.  <u>Graves v. Kemsco Group, Inc.</u>, 864 F.2d 754, 756.

The Fifth Circuit has held that in a civil contempt proceeding involving the violation of a patent infringement injunction, the court has the power to award double damages.  <u>Dow Chem. Co.</u>, 434 F.2d at 1214-15.  In the original Findings of Fact and Conclusions of Law entered in the Final Judgment of this case, the Court found, in calculating damages by establishing a hypothetical reasonable royalty, that 25% of Adcon's gross sales would be a reasonable royalty.  <u>Cf</u>. Findings of Fact and

Conclusions of Law, p. 13 - 14.  Flowdata is thus entitled to an order decreeing that Cotton shall pay over to Flowdata as royalty, 50% of all amounts received from the manufacture, use, and/or sale of the TruGear meter during the period from August 2, 1993, through the date of the final accounting.

Flowdata is entitled to an order decreeing that Cotton is enjoined from making, using, and/or selling any positive displacement flowmeter.  If Cotton, or any above described entity, has a good faith belief that he can clearly and convincingly show that he has a new design for a positive displacement flowmeter which does not infringe claim 7 of the '318 Patent, then Cotton shall make verified application to this Court for relief from the pertinent provisions of this Order.  In such application, Cotton shall set forth full details of the redesigned device and verify that the device has been constructed with the relevant technical documentation made fully available to Flowdata so that Flowdata may have opportunity to conduct inspection and testing of the redesigned device and make comment to the Court prior to the Court's ruling on the application for relief from this Order.  Cf. Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 903 F.2d 1568 (Fed. Cir. 1990).

> The district court did not abuse its discretion in broadening the injunction to cover "any automated rotor spinning machine," without the qualifying word "infringing."  Similarly in view of the defendants' sale of machines with minor modifications that did not avoid infringement, it was not unreasonable for the court to require that before the defendants attempted sales of other modified machines, they first must obtain the district court's permission.  These stringent provisions

of the decree reflect the old adage that "those caught violating the law must expect some fencing in."

<u>Id.</u>, at 1577.

Flowdata is entitled to an order decreeing that Cotton file with the Court quarterly sworn statements certifying that based upon his individual investigation of all relevant information available to him, and confirmed by competent written opinion of an attorney, that all provisions required in this Order have been fully satisfied with. <u>Cf</u>. <u>Spindelfabrik Suessen-Schurr</u>, 903 F.2d at 1577.

Flowdata is entitled to an order decreeing that Cotton shall post a good and sufficient security bond or cash bond in the amount of $300,000 for security during the pendency of a Final Judgment herein. <u>Cf</u>. <u>Whittaker Corp. v. Execuair Corp.</u>, 953 F.2d 510 (9th Cir. 1992).

Flowdata is entitled to an order decreeing that all amounts ordered to be paid by Cotton, whether to the Court or to Flowdata, shall be construed as civil fines issued to uphold the dignity of this Court as a result of Cotton's violation of this Court's Injunction.

**SIGNED** at Houston, Texas, this  11th  day of July, 1994.

Melinda Ha
**MELINDA HARMON**
UNITED STATES DISTRICT JUDGE